Concepcion Perez ROSADO, Plaintiff,

v.

**Jo Anne B. BARNHART,
Commissioner of Social
Security, Defendant.**

No. 01 CIV. 3063(VM).

United States District Court,
S.D. New York.

Nov. 13, 2003.

## DECISION AND ORDER

MARRERO, District Judge.

Plaintiff Concepcion Perez Rosado ("Rosado")commenced this action pursuant to 42 U.S.C. § 405(g) (" § 405(g)") to review the final determination of the Commissioner of Social Security (the "Commissioner") that denied her application for disability benefits. Rosado alleges errors entitling her to a new administrative hearing. The Commissioner disagrees. Rosado and the Commissioner have filed a motion and cross-motion, respectively, for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For the reasons set forth below, Rosado's motion is GRANTED and the Commissioner's

motion is DENIED. The case is RE-MANDED to the Commissioner for further proceedings consistent with this Decision and Order.

## I. *BACKGROUND*

### A. *PROCEDURAL HISTORY*

Rosado filed an application for Supplemental Security Income ("SSI") benefits on August 3, 1998 pursuant to Title XVI of the Social Security Act ("the Act"), 42 U.S.C. § 301 *et seq.* (Tr. at 69.)[1] Rosado claims that she is unable to work due to depression, nervousness, and panic attacks. (Tr. at 12, 72, 75.) Her application was denied initially on December 17, 1998 and again on reconsideration on March 5, 1999. (Tr. at 39, 45.) Rosado subsequently requested a hearing (the "Hearing"), which was conducted before Administrative Law Judge Dennis G. Katz (the "ALJ") on August 24, 1999. (Tr. at 24–36.)

In a decision dated August 31, 1999, the ALJ found that Rosado was not disabled within the meaning of the Act. Specifically, the ALJ concluded that although Rosado had "severe" mental impairments under the Act that prevented her from performing tasks that require excessive concentration and significant interaction with the public, she retained the capacity to perform the physical requirements of work activity. (Tr. at 19.) The ALJ further concluded that based on Rosado's residual functional capacity (hereinafter "RFC")[2] and vocational factors, there are jobs in the national and regional economies that Rosado could perform, and thus that she was not disabled within the meaning of the Act. (Tr. at 20.)

On December 6, 2000, the ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Rosado's request for review. (Tr. at 3.) Rosado initiated the present action to seek review of the Commissioner's determination. After the Commissioner filed her answer, Rosado moved for judgment on the pleadings, to which the Commissioner filed a cross-motion for judgment on the pleadings.

### B. *FACTUAL BACKGROUND AND MEDICAL EVIDENCE*

Rosado was born in Puerto Rico on October 3, 1953 and was 44 years old when she filed her application for SSI benefits. (Tr. at 69.) In 1976 she moved to New York, where she lived with her children and her husband. (Tr. at 122.) Rosado separated from her husband several years ago and is presently living with five of her six children. (*Id.*) She is educated through the third grade, and is not sufficiently literate in English nor is she able to communicate in the English language. (Tr. at 19, 122.) Rosado states that she has never worked, and claims to have been unable to work since 1973 due to her condition. (Tr. at 11, 77, 122.)

In documents submitted to the Social Security Administration ("SSA") in connection with her application for SSI benefits, Rosado claims that she suffers from persistent anxiety, depression, and fear that something bad will happen. (Tr. at

---

1. "Tr." refers to the transcript of the Administrative Record the Commissioner filed on November 26, 2002, pursuant to 42 U.S.C. § 405(g).

2. Regulations promulgated by the Commissioner of the Social Security Administration (the "SSA") define RFC as an individual's ability to do sustained work-related activities in a work setting on a regular and continuing basis, after taking into account the effects of physical and/or mental limitations. *See* 20 C.F.R. § 416.945; Social Security Ruling ("SSR") 96–8p, 1996 WL 374184, at *1.

75, 85.) She complains of getting nervous when she is out in public and asserts that cannot take public transportation alone out of fear of getting lost or of being harmed. (Tr. at 126–27.) Rosado also asserts that she has frequent trouble sleeping and suffers from depression. (Tr. at 72, 95.)

Rosado's medical records indicate that she received treatment at the Grand Concourse Clinic by Drs. Teresa and Soto in 1998 and by Dr. Spillman since 1997. (Tr. at 51–52, 73, 84, 131.) Rosado was prescribed Serzone and Buspar, medications for the treatment of depression, anxiety, and insomnia. (Tr. at 51, 84, 91.) Rosado was also treated at the outpatient clinics at both Union Hospital and at the Bronx Lebanon Hospital on several occasions from 1995 through May 1998 for different physical ailments. (Tr. at 100, 104–17.)

On November 14, 1997, Maria Enriquez ("Enriquez"), a social worker, interviewed Rosado and completed a questionnaire that recorded Rosado's claimed symptoms, along with Enriquez's own observations. (Tr. at 94–99.) The questionnaire reported that Rosado complained of depression; forgetfulness; nervousness; difficulty sleeping and nightmares; crying spells; palpitations; loss of interest in daily activities; and a constant fear for her children's safety and that something bad is going to happen. (Tr. at 95.)

Enriquez noted at that time that Rosado's appearance and behavior seemed normal, that she had good continuity of thought and an adequate attention span, and that Rosado had exhibited no evidence of perceptual disorder during the interview. (Tr. at 97–98.) Enriquez also noted that Rosado had remote memory impairment and was socially isolated. (Tr. at 95, 98.) Enriquez's diagnostic impression was

that Rosado suffers from "major depression." (Tr. at 95, 99.) [3]

On September 15, 1998, Dr. Michael Polak, an internist, performed a physical examination on Rosado at the request of the SSA. Dr. Polak found Rosado to be physically well developed and that she would have no difficulty performing activities requiring basic physical movements, for example, pushing/pulling, sitting, walking, bending, etc. (Tr. at 118–19.) He also noted evidence of psychomotor retardation. (Tr. at 199.) Dr. Polak diagnosed Rosado as suffering from depression and recommended that she undergo psychiatric evaluation. (Id.)

On the same day, Dr. Robert Cicarell performed a psychiatric evaluation of Rosado at the request of the SSA. (Tr. at 122–24.) Dr. Cicarell reported many of Rosado's complaints, including depression, anxiety, difficulty sleeping, intermittent suicidal ideations, and auditory hallucinations. (Tr. at 122.) Although Dr. Cicarell found Rosado's overall intellectual functioning to be within normal limits, his diagnostic impression was "major depression, most likely recurrent, moderate to severe in intensity, with psychotic features." (Tr. at 123.) The report concludes by stating that Rosado has a "limited ability to understand, carry out and remember instructions." (Tr. at 124.)

On November 13, 1998, Edward J. Tucker ("Tucker"), a certified social worker, visited Rosado at her home to conduct a psychosocial interview in connection with her application for benefits. (Tr. at 125.) Tucker recorded many of the same complaints Rosado previously made regarding her mental state, namely, anxiety, depression, and the resulting effects. Tucker

3. The record contains a subsequent form Enriquez filled out on December 4, 1997, in which Enriquez restates her diagnostic impression of Rosado as depression. (Tr. at 101–103.)

also noted Rosado's poor living conditions in a high-crime area. (Tr. at 125–26.) According to Tucker, Rosado responded openly to questions and was coherent during the interview. (Tr. at 126.) Rosado exhibited well organized thought processes, although Tucker found her to be "a bit simple-minded." (*Id.*)

On December 9, 1999, two state agency medical consultants, Drs. C. Anderson and C. Khalil, evaluated the medical evidence in the record and filled out a Psychiatric Review Technique Form provided by the SSA. (Tr. at 135–146.) These physicians rated Rosado as "not significantly limited" in the areas of understanding and memory; sustained concentration and persistence; and social interaction. (Tr. at 144–45.) Rosado was rated as "moderately limited" in the areas of responding appropriately in a work setting and in the ability to travel to unfamiliar places or use public transportation. (Tr. at 145.) Drs. Anderson and Khalil concluded that there was no evidence of significant psychotic symptoms and that Rosado was able to understand, concentrate, remember, adapt, relate, and perform simple repetitive tasks. (Tr. at 146.) They diagnosed Rosado as suffering from major depression and affective disorder. (Tr. at 37–38, 138.)

Rosado's treating psychologist, Dr. Allison Spillman, filled out an SSA evaluation form for Rosado on January 9, 1999. (Tr. 131–134.) Dr. Spillman recorded many of Rosado's claimed symptoms that had previously been recorded, including anxiety, depression, and crying spells. (Tr. at 131.) With regard to Rosado's ability to function in a work setting, Dr. Spillman answered "unable to evaluate." (Tr. at 133.) Similarly, in the space on the form requesting her medical opinion regarding Rosado's ability to do work-related mental activities,

Dr. Spillman responded "unable to determine." (*Id.*) Other than recording Rosado's symptoms and treatment history, there is little in the way of detailed medical evaluation and diagnosis on the form. The record is likewise devoid of any other substantive medical analysis by Dr. Spillman, or any other treating source, as to Rosado's mental capability to perform work.

Notably, the certified copy of the administrative record the Commissioner filed with her answer (and presumably the record the ALJ had before him when he made his determination) contains only pages 2, 4, 6, and 8 of the form Dr. Spillman filled out. Pages 3, 5, 7 are not included in the record.[4] The Commissioner, however, concedes that although Dr. Spillman was provided with a two-sided eight-page form, the back of three pages (numbered 3, 5, and 7) were blank when the form was returned. (*See* Riley Dec. at ¶ 3.) The record does not indicate that the ALJ made any inquiry as to why these pages were returned with the odd-numbered side blank. No further evidence was solicited from Drs. Spillman or Teresa concerning Rosado's mental capacity to engage in work-related activities.

## II. *DISCUSSION*

### A. *STANDARD OF REVIEW*

In deciding a motion for judgment on the pleadings, the Court is generally limited to considering the factual allegations set forth in the complaint and corresponding answer. *See* Fed.R.Civ.P. 12(c). A party is entitled to judgment on the pleadings only if it is clear that no material issues of fact remain to be resolved and that the movant is entitled to judgment as a matter of law. *Juster Assocs. v. Rut-*

---

4. Page 1 of the form was not forwarded apparently because it is not part of the evalua-

tion. (*See* Declaration of Michael J. Riley, dated May 5, 2003, ("Riley Dec.") at ¶ 3(a).)

*land,* 901 F.2d 266, 269 (2d Cir.1990) (citations omitted); *McFadden v. Barnhart,* No. 94 Civ. 8734, 2003 WL 1483444 (S.D.N.Y. March 21, 2003), at *3.

■ When reviewing a denial of disability benefits, the Court first reviews the Commissioner's decision "to determine whether the Commissioner applied the correct legal standard." *Tejada v. Apfel,* 167 F.3d 770, 773 (2d Cir.1999); *Townley v. Heckler,* 748 F.2d 109, 112 (2d Cir.1984) ("Failure to apply the correct legal standards is grounds for reversal."). In this regard, the Second Circuit has stated that:

> [w]here there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles.

*Johnson v. Bowen,* 817 F.2d 983, 986 (2d Cir.1987).

Next, the Court "examines the record to determine if the Commissioner's conclusions are supported by substantial evidence." *Tejada,* 167 F.3d at 773; *Schaal v. Apfel,* 134 F.3d 496, 501 (2d Cir.1998). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation omitted). The Court carefully considers the entire record, including any conflicting evidence, "because an analysis of the substantiality of the evidence must also include

that which detracts from its weight." *Quinones v. Chater,* 117 F.3d 29, 33 (2d Cir. 1997) (internal quotations omitted). If the Court finds that there is substantial evidence to support the Commissioner's decision after reviewing the record as a whole, that decision "must be upheld." *Martinez v. Massanari,* 242 F.Supp.2d 372, 375 (S.D.N.Y.2003); *accord Alston v. Sullivan,* 904 F.2d 122, 126 (2d Cir.1990).

**B.  *DETERMINATION OF DISABILITY***

For SSI benefit purposes, a person is "disabled" if he "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment ... which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). Furthermore, an individual's impairment must be severe enough to preclude maintaining "substantial gainful work which exists in the national economy" when considering age, education, and prior work experience. *See* 42 U.S.C. § 423(d)(2)(A).[5]

■ In assessing a claim of disability, the ALJ must consider the following factors: (1) objective medical facts and clinical findings; (2) diagnosis and medical opinions of examining physicians; (3) subjective evidence of the claimant's pain and disability as the claimant or others have testified to; and (4) the claimant's educational background, age, and work experience. *See Mongeur v. Heckler,* 722 F.2d 1033, 1037 (2d Cir.1983); *Morillo v. Apfel,* 150 F.Supp.2d 540, 545 (S.D.N.Y.2001).

---

5.  More particularly, the Act provides:
An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, consid-
ering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy ...
42  U.S.C. § 423(d)(2)(A).

The SSA has established a five-step procedure for evaluating disability claims. *See* 20 C.F.R. § 404.1520(a)(4). A finding of no disability at any one step ends the inquiry without proceeding to the sequential step. *See id.* First, the ALJ asks whether the claimant is currently engaged in substantial gainful activity. If not, at step two, the ALJ determines whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to perform basic work activities. Third, if the claimant suffers a "severe impairment" that is listed in Appendix 1 of the regulations,[6] there is a presumption of disability. Fourth, if the claimant's "severe impairment" is not listed in Appendix 1, the ALJ determines whether the claimant has the RFC to perform previous work the claimant performed. Finally, at step five, if the claimant is unable to perform past relevant work, or has no previous work history, the ALJ ascertains whether there is other work that the claimant is capable of performing in light of the RFC. *See id.; see also Rosa v. Callahan,* 168 F.3d 72, 77 (2d Cir.1999) (citing *Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982) (per curiam)); *Morillo v. Apfel,* 150 F.Supp.2d 540, 545 (S.D.N.Y.2001).

The burden lies with the claimant to prove the requirements of the first four steps, but shifts to the Commissioner at step five. *See Perez v. Chater,* 77 F.3d 41, 46 (2d Cir.1996); *Aubeuf v. Schweiker,* 649 F.2d 107, 112 (2d Cir.1981).

SSA regulations require the ALJ to utilize a "special technique" at each step of the administrative review process when a claimant suffers from a mental impairment. *See* 20 C.F.R. § 416.920a. At step two of the procedure detailed above, the ALJ must rate the degree of functional limitation resulting from the claimant's mental impairment(s) to determine whether they are "severe." *Id.* at § 416.920a(1). For this purpose, the claimant's limitations in four "broad functional areas" are rated along a five-point scale ranging from no limitation to extreme limitation. *Id.* at § 416.920a(c)(4). The four areas are: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation.[7] *See id.* A ranking of no or "mild" limitation in all of these areas would generally warrant a finding that the claimant's mental impairments are not severe. *Id.* at § 416.920a(d)(1). If the claimant's mental impairments are severe, then at step three the ALJ must determine whether the impairments meet or are equivalent to a listed mental disorder. *See id.* at § 416.920a(d)(2). If the claimant is found to have a severe impairment not listed in the Appendix, then, at steps four and five, the ALJ must assess the claimant's mental RFC to determine whether the claimant can meet the mental demands of past relevant work in spite of the limiting effects of her impairment and, if not, whether the claimant can do other work, considering her remaining mental capacities and her occupational base, age, education, and work experience. *See id.* at § 416.920a(d)(3); SSR 85–15, 1985 WL 56857 (S.S.A.), at *4.

When the question at the fifth step is whether the claimant can be expected to perform unskilled work, the SSA regulations clarify that:

> [t]he basic mental demands of . . . unskilled work include the abilities (on a sustained basis) to understand, carry

---

**6.** "Appendix 1" and "the Appendix" refer to 20 C.F.R. Pt. 404, Subpt. P.App. 1, § 12.00.

**7.** Because these four functional areas are used in Paragraph B of the mental impairment listings in the Appendix, they are often referenced as the "B Criteria."

out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting. A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base. This, in turn, would justify a finding of disability. . . .

SSR 85–15, 1985 WL 56857 (S.S.A.), at *4.

■ In implementing the five-step sequential evaluation process outlined above, the ALJ is under an affirmative duty to adequately develop the medical record. *See* 20 C.F.R. § 416.912(d) (stating that the SSA will make reasonable efforts to obtain a complete medical history from treating sources); *see also Tejada*, 167 F.3d at 774. The ALJ is thus "obligated to explore the facts by obtaining relevant medical records and asking questions ... to assist the claimant in developing her case." *Jones v. Apfel*, 66 F.Supp.2d 518, 538 (S.D.N.Y.1999); *see also Perez*, 77 F.3d at 47 (holding that where there are deficiencies in the record, the ALJ is under an affirmative obligation to develop the relevant medical history). This duty becomes even more paramount when, as in this case, the claimant is unrepresented at the hearing. *See Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir.1990) ("[W]hen the claimant is unrepresented, the ALJ is under a heightened duty to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts, ...") (internal quotations and citations omitted).

The ALJ's duty to assist a claimant in obtaining complete medical records works in tandem with the so-called "treating physician rule," which requires the ALJ to grant controlling weight to the opinion of a claimant's treating physician if the opinion is well supported by medical findings and is not inconsistent with other substantial evidence. *See* 20 C.F.R. § 404.1527(d)(2); 20 C.F.R. § 416.927(d)(2). The treating physician rule is enforced by courts. *See, e.g., Rosa v. Callahan*, 168 F.3d 72, 78–79 (2d Cir.1999); *Clark v. Commissioner of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir.1998); *Morillo*, 150 F.Supp.2d at 545–46; *Jones*, 66 F.Supp.2d at 538. As one court aptly explained:

What is valuable about the perspective of the treating physician—what distinguishes him from the examining physician and from the ALJ—is his opportunity to develop an informed opinion as to the physical status of a patient. To obtain from a treating physician nothing more than charts and laboratory test results is to undermine the distinctive quality of the treating physician that makes his evidence so much more reliable than that of a examining physician who sees the claimant once and who performs the same tests and studies as the treating physician. . . . Thus, when the claimant appears pro se, the combined force of the treating physician rule and of the duty to conduct a searching review requires that the ALJ make every reasonable effort to obtain not merely the medical records of the treating physician but also a report that sets forth the opinion of that treating physician as to the existence, the nature, and the severity of the claimed disability.

*Peed v. Sullivan*, 778 F.Supp. 1241, 1246 (E.D.N.Y.1991). Thus, a proper application of the treating physician rule mandates that the ALJ assure that the claimant's medical record is comprehensive and complete.

As is evident from the preceding discussion, administrative decisions of the SSA denying claimants' benefits remain subject to particularized judicial scrutiny despite an apparently deferential standard of review. This scrutiny arises primarily from

the Commissioner's own regulations to which ALJs must carefully adhere. Accordingly, the failure to do so is considered "legal error" that permits reversal of the ALJ's decision. The duty to fully develop the record and the treating physician rule are but two examples of the parameters within which ALJ determinations are required to be made.

## C. *THE ALJ'S DECISION*

In his August 31, 1999 decision, the ALJ discussed the five-step evaluation process and determined that step one was inapplicable given Rosado had no work experience. (Tr. at 12.) At step two, the ALJ concluded that Rosado suffers from "severe" mental impairments within the meaning of the Act that would tend to impose more than a minimal or slight limitation on Rosado's ability to perform basic work functions. (Tr. at 13–14.) The ALJ further determined at step three that these impairments do not match any listed impairment in the Appendix. (Tr. at 14.) Recognizing that an RFC assessment was therefore necessary, the ALJ proceeded to apply the four broad "B" criteria functional areas and rated Rosado as follows: "activities of daily living": no limitations; "social functioning": slightly impaired; "concentration, persistence and pace": often deficient; and "deterioration or decompression in work or work-like settings": never. (Tr. at 14–17.) These ratings appear to have been based more on the evidence in the record indicating that Rosado can perform basic household chores and care for herself and her young children, and less on medical evidence. (Tr. at 15–17.)

The ALJ stated that there was "no evidence that [Rosado] ... is incapable of functioning independently outside the area of her home." (Tr. at 17.) Based primarily on Dr. Anderson's and Dr. Khalil's as-

sessments of the medical evidence being consistent with the other medical findings in the record, the ALJ stated that Rosado is "mentally capable of performing substantially all unskilled jobs." (Tr. at 17.)

The ALJ found step four inapplicable because Rosado had no past relevant work. (Tr. at 18.) At step five, the ALJ relied upon a vocational expert, Edna Clark ("Clark"), to meet the Government's burden under the regulations to demonstrate that there are employment opportunities that Rosado is capable of performing. (Tr. at 18–19.) After being given a hypothetical vocational profile based on Rosado's RFC that the ALJ determined, Clark testified that there were jobs in the national and regional markets that Rosado could perform. (*Id.*) The ALJ ultimately concluded that Rosado is able to perform all the physical requirements of work activity, but is limited to performing tasks that do not require excessive concentration and that only require minimal interactions with the public. (Tr. at 19.) The limited findings of Dr. Spillman, although considered, did not figure prominently into this portion of the ALJ's decision.

## D. *ANALYSIS*

After a review of the administrative proceedings in this case, the Court is persuaded that the ALJ's determination does not comport with the applicable regulations and related standards. The ALJ does not make clear in his decision the relative weight he attributes to the reports of the treating and consulting physicians, and he does not endeavor to fill the gaps and fully develop Rosado's medical records. At step five of the evaluation process, the ALJ was required to assess Rosado's ability to perform the basic mental requirements of work. *See* SSR 96–8p, 1996 WL 374184 (S.S.A.), at *6. The medical records in this case, particularly in view of Dr. Spillman's

apparently incomplete report, are inadequately developed to enable the ALJ to make such an assessment. Furthermore, as discussed below, the ALJ did not properly assess Rosado's mental RFC under the applicable regulations.

■ Rosado argues that the fact that the ALJ did not have pages 3, 5, and 7 of the form provided to Dr. Spillman, rendered the record inadequate, and thus that the ALJ's analysis is legally flawed on this basis. (*See* Memorandum of Law In Support Of Plaintiff's Motion For Judgment On The Pleadings, dated April 4, 2003, at 17–19.) In response, the Commissioner, through an affidavit of an individual responsible for processing claims appealed through a civil action, simply states that the SSA did in fact receive all the pages forwarded to Dr. Spillman, but that the odd-numbered pages where blank. (*See* Declaration of Michael Riley, dated May 5, 2003, at ¶ 3.)

The Commissioner's response is inadequate in light of the ALJ's duties to fully develop the record and apply the treating physician rule. The Court doubts that the ALJ could have met these critical obligations when important information from a treating medical source was obviously missing. The oversight may have been harmless had these pages contained information irrelevant to this case. The Court, however, finds to the contrary. Page 3 of the form requests information regarding the claimant's treatment and response to treatment. (*See* Declaration of Michael Riley, dated May 5, 2003, at Ex. 1.) Page 5 requests medical findings with regard to various categories relating to "mental status." (*Id.*) Finally, page 7 requests findings with regard to understanding and memory; sustained concentration and persistence; social interaction; and adaption. (*See id.*) Indeed, the information requested in these pages is critical to determining whether Rosado has the mental capability to maintain gainful employment. Accordingly, the ALJ was under an affirmative duty to make reasonable efforts to contact Dr. Spillman to fill the gaps in the record. *See Schaal v. Apfel,* 134 F.3d 496, 505 (2d Cir.1998) ("[e]ven if the clinical findings were inadequate, it was the ALJ's duty to seek additional information from … [the treating source] *sua sponte.*") (internal quotations and citations omitted). The ALJ cannot rely on the *absence* of evidence, and is thus under an affirmative duty to fill any gaps in the record. *See id.*

The Court finds similarly deficient the ALJ's uncritical acquiescence of Dr. Spillman's responses to important questions. The Commissioner argues that in light of Dr. Spillman's scant or partial response, Dr. Spillman was unable to evaluate Rosado's ability to function in a work setting, and that there was no need to contact Dr. Spillman further. (*See* Memorandum Of Law In Opposition To Plaintiff's Motion, dated May 27, 2003, at 21.) The Court disagrees. This question, and the question of whether Rosado possesses the ability to perform work-related functions, are at the heart of the issue in this case, and hence, Dr. Spillman's responses that she was unable to evaluate Rosado's mental limitations in a work-setting should not have ended the inquiry. As explained above, the ALJ has an affirmative duty to seek complete medical information, especially from treating sources, and particularly when the claimant appears at the hearing pro se. Under these standards, the ALJ failed to take reasonable steps to fill these gaps, either from Dr. Spillman or an alternate treating physician. There may have been many reasons, some potentially bearing on the disposition of Rosado's application, as to why Dr. Spillman may have reported that she could not make these determinations. The ALJ, however, made

no effort to determine what the reasons were and how otherwise to obtain that vital information. *See Devora v. Barnhart,* 205 F.Supp.2d 164, 172–73 (S.D.N.Y. 2002) ("The duty of the ALJ to develop the record is particularly important when it comes to obtaining information from a claimant's treating physician."); *see also Rosa,* 168 F.3d at 79–80 (stating that the ALJ may not rely on sparse notes nor conclusory assessments from the treating physician).

Because the ALJ did not have a complete and comprehensive medical record from treating sources before him when he determined that Rosado was not disabled, it necessarily affected both his RFC assessment of Rosado and the vocational hypothetical that he gave to Clark under step five of the evaluation process. *See Aubeuf v. Schweiker,* 649 F.2d 107, 114 (2d Cir.1981) (stating that testimony of a vocational expert is only useful if it addresses the particular limitations of the claimant). Accordingly, the Court is persuaded that the ALJ erred by not pursuing any means, by further inquiry of Dr. Spillman or otherwise, to fill the gaps in the record that were left by Rosado's treating physician.

■ The Court further finds that the ALJ failed to assess Rosado's mental RFC as specified by the relevant SSA regulations. *See* 20 C.F.R. § 416.920a; § 416.945. The ALJ's discussion makes clear that Rosado's RFC assessment was made by applying the four broad "B" criteria. (Tr. at 14–17.) As this Court discussed in *Pabon v. Barnhart:* "[u]se of the four broad functional categories outlined in § 416.920a to determine whether a claimant's impairments are 'severe' is not equivalent to a mental RFC assessment." 273 F.Supp.2d 506, 515 (S.D.N.Y.2003). Under steps two and three of the sequential evaluation procedure, the ALJ must utilize a "special technique" in determining wheth-er the claimant's mental impairments are severe. *See* 20 C.F.R. § 416.920a(a) & (b). Although this technique involves rating the claimant's degree of functional limitation under the four "B" criteria, once this determination is completed, the ALJ must proceed to assess RFC as part of steps four and five. *See* 20 C.F.R. § 416.920a(c) & (d). Thus, the use of the "B" criteria to determine whether Rosado's impairments are "severe" is a separate and distinct step from assessing her mental RFC, which is expressed as work-related functions. *See id.* § 416.920a; § 416.945. Social Security Ruling 96–8p explains an RFC assessment in greater detail. *See* SSR 96–8p, 1996 WL 374184 (S.S.A.), at *4 (stating that determining RFC requires a more detailed assessment than the criteria used to rate the severity of mental impairments); *see also* 20 C.F.R. Pt. 404, Subpt. P. App. 1 § 12.00(A) (stating that RFC "complements" assessment under the "B" criteria by requiring consideration of an expanded list of work-related capacities that may be affected by mental disorders).

Although the ALJ did mention these work-related capacities, for example, understanding instructions, using judgment, and responding to supervision (Tr. at 17), a more detailed analysis of Rosado's mental RFC, based on a complete medical record, is lacking. *See* SSR 96–8p, 1996 WL 374184 (S.S.A.), at *6; *see also Martone v. Apfel,* 70 F.Supp.2d 145, 150 (N.D.N.Y. 1999) ("In assessing RFC, the ALJ's findings must specify the functions plaintiff is capable of performing; conclusory statements regarding plaintiff's capacities are not sufficient.") (citations omitted).

The ALJ's failure to seek additional medical evaluation from Dr. Spillman and to apply the proper standard to assess Rosado's ability to meet the mental demands of work, deprived Rosado of a "full hearing under the ... [Commissioner's]

regulations and in accordance with the beneficent purposes of the [Social Security] Act." *Echevarria v. Secretary of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982).

### E. DISPOSITION

■ Remand to the Commissioner is the appropriate remedy where, as here, the ALJ incorrectly applied the law and failed to adequately develop the medical record. *See Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir.1996) ("When there are gaps in the administrative record or the ALJ has applied an improper legal standard, we have, on numerous occasions, remanded to the ... [Commissioner] for further development of the evidence.") (citation omitted); *see also Rosa*, 168 F.3d at 83 (remanding to the Commissioner for further development of the evidence where the ALJ "failed to fulfill her duty in [the claimant's] case in several respects.") (internal quotations and citation omitted).

On remand, the ALJ must further develop the record concerning Rosado's ability to perform work-related activities, in light of her mental impairment. Toward this end, the ALJ should make all reasonable efforts to obtain updated treatment records, including a statement from Rosado's treating source about Rosado's ability to handle the mental demands of unskilled work, and otherwise to adequately complete the record through the professional evaluations provided for in the applicable regulations. *See* 20 C.F.R. § 416.927(f)(2)(iii). Finally, because Rosado's application for benefits has been pending for more than five years, the Court urges the Commissioner to expedite the proceedings on remand.

In her Notice of Motion, Rosado seeks reasonable attorney's fees under the Equal Access To Justice Act ("EAJA"), 28 U.S.C. § 2412(d). The relevant provision of the EAJA states that a court: "shall award to the prevailing party ... fees and other expenses ... brought against the United States ... unless the Court finds that the position of the United States was substantially justified or that special circumstances make an award unjust." *Id.* Neither party has briefed the question of whether the award of fees in this case is warranted under the "prevailing party" requirement as construed by the most recent United States Supreme Court and Second Circuit precedents. *See Buckhannon Bd. & Care Home, Inc. v. West Va. Dep't of Health & Human Res.*, 532 U.S. 598, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001); *Roberson v. Giuliani*, 346 F.3d 75 (2d Cir.2003); *Union of Needletrades, Indus. & Textile Employees v. U.S. INS*, 336 F.3d 200 (2d Cir.2003). If Rosado wishes to pursue this claim, the parties are directed to brief the issue in this light.

### III. CONCLUSION AND ORDER

For the reasons discussed above, it is hereby

**ORDERED** that the motion of plaintiff Concepcion Perez Rosado ("Rosado") for judgment on the pleadings seeking remand to the defendant Commissioner of Social Security (the "Commissioner") is GRANTED. The Commissioner's decision on Rosado's application for disability benefits is vacated and remanded for further administrative proceedings consistent with this Decision and Order; and it is further

**ORDERED** that the Commissioner's motion for a judgment on the pleadings is DENIED.

This remand is ordered pursuant to sentence four of 42 U.S.C. § 405(g). Accordingly, a final judgment remanding the case will be entered. This Court retains jurisdiction over this case for the purposes of enforcement of this Order in connection

with any future proceedings related to this application, and for the determination of Rosado's eligibility to recover attorney's fees, if such a claim is pursued.

The Clerk of Court is directed to close this case.

**SO ORDERED.**